439 P.2d 697

James M. WEAVER, Plaintiff-Appellant,

v.

VILLAGE OF BANCROFT, Defendant-Respondent.

No. 10151.

Supreme Court of Idaho.

April 19, 1968.

**190**

Callis A. Caldwell, Pocatello, for appellant.

Wallace M. Transtrum, Soda Springs, for appellee.

SPEAR, Justice.

James Weaver (appellant herein) brought this suit against the Village of Bancroft (hereinafter "Village") alleging that he was the owner of certain real property improved by a house and garage, and that prior to the purchase of this property the Village had maintained a certain ditch and placed culverts in said ditch along the road in front of and immediately adjoining his premises. He alleged that thereafter the Village tore out these culverts and widened the ditch, thereby isolating his property and creating a nuisance which lowered the value of his property in the amount of $4,000.

From a determination that the culvert was jointly owned by appellant and the Village, that both were responsible for its upkeep and maintenance and that the Village had honored its responsibility by providing materials and tendering a portion of the labor for reconstruction of the culvert or construction of a vehicular bridge which appellant refused to accept, he appeals.

At the outset of the trial, appellant moved to amend his complaint for the purpose of clarification, so that it included an allegation of substantial impairment to his right of ingress and egress to the described premises by reason of the Village's actions in enlarging the ditch and removing the culvert. Damages were also reestimated in the amount of $5,500. This motion was granted by the court.

The testimony discloses that in 1953 appellant approached Mr. Lester Tolman to see about buying a certain piece of property for the purpose of building a home thereon. At this time there was a ditch located in front of the property, approximately 8 feet wide and 5 to 6 feet deep running along the edge of the property. Appellant advised Tolman that something would have to be done about this ditch before he would purchase.

Appellant and Tolman thereafter went to the Village Board to discuss this problem with them in the early part of 1953, and as a result of this meeting, according to appellant, a portion of the ditch was laid with a steel culvert at each end and then covered with earth. Appellant thereafter purchased the property and began to build his home thereon.

On cross-examination, appellant testified that when he bought this property he was well aware of the existence of this ditch and its purpose, namely, to carry flood waters around the Village. As to the first portion of this culvert which was laid in 1953, appellant did not know where it came from or at whose expense it was purchased, but he assisted Mr. Tolman in the installation work.

Sam Reed, a former resident of the Village who had served on the Village Board from 1943 to 1954, testified that the Board took no action with respect to appellant's request in 1953 and that the Board refused to do anything with the ditch as far as putting in a culvert.

Appellant's home, built out of cinder blocks with a solid concrete-slab floor, was situated on the east side of his property line to the west of the street and drainage ditch. In order to build his house he had to lower the level of the ground immediately abutting the ditch by some several feet approximating 8 to 10 cinder blocks high. In the rear portion of appellant's lot, which was approximately two and a quarter acres, he constructed a barn or shelter for some livestock and installed a gasoline storage tank. At this time, there was nothing to prevent vehicular access from the street to the property: hay and feed for the livestock were trucked into his backyard, as well as wholesale gas for the pump.

In 1962 appellant desired to enlarge his house and make other improvements on the property and so met with the Village Board to see if they would complete the covering of the ditch before he invested more money.

As a result of this meeting, the balance of the ditch was laid with concrete tile and covered with earth by the Village.

Thereafter appellant enlarged his home, laid a gravel driveway and built a garage so he could accommodate off-street parking, planted a lawn, and added a retaining wall at one end of his property to protect his children from the exposed portions of the ditch off his premises. Appellant then had vehicular access to and from the street from and to the garage.

During the early part of February, 1963, as a result of severe flooding, the Village removed appellant's culvert and exposed the ditch.

Fred Modersitzki, a member of the Village Board, as well as the Civil Defense Disaster Board, testified he took part in the considerations leading to the removal of appellant's culvert. This decision was ultimately reached in his capacity as Civil Defense Director. He explained that the culvert had partially caved in and was filling up with dirt and other debris causing a severe blockage and backup of the flood waters. Following removal of the culvert, the ditch was substantially enlarged in order to accommodate better drainage for future floods. The ditch was thereafter maintained by the Village.

The enlarged ditch, which was now about 10 feet deep and 20 feet wide with unreinforced vertical walls, effectively cut off all vehicular access to the premises. Pedestrian access was maintained by means of a narrow foot bridge, approximately three feet wide and without railings, built by the Village as a temporary measure. This was appellant's only means of access between his home and the street. Appellant was now forced to leave his car on the street and couldn't make use of vehicular access in order to supply his animals with feed or fill his gas pump.

Appellant's wife testified that they were unable to get the animals over this foot bridge and that feeding them remained quite a problem as the feed now had to be stored alongside the road on the far side of the ditch. Moreover, there was no other means of access onto the premises as it was completely surrounded by property owned by neighbors. She approximated that the exposed ditch was located about 20 feet in front of the house.

As owner of the property appellant estimated its fair market value, prior to removal of the culvert and enlargement of the ditch, to be $14,500, based upon the amount of money he had put into the place —costs and improvements. Because of the exposed ditch appellant moved his family and sold the premises, for $9,000. He could not obtain a better price.

During cross-examination, appellant was called upon to enumerate those considerations which he took into account in arriving at a $14,500 fair market value. He testified that one of these considerations was a comparison of the price he had paid for his new home in Virginia, Idaho, as well as the money he had expended on the old premises. He did not include the price of his labor in this estimate, but he was unable to break this figure down or substantiate it. His wife had kept the records, but they were not introduced in evidence nor was she interrogated concerning such records either on direct or cross-examination.

D. W. Grimm, a long-time resident of Bancroft, testified that market values for real property were generally down 50% after 1963 because of the floods. In aid of objection, appellant's counsel elicited the following testimony:

"(Q) Are you a real estate man?

"(A) No.

   *     *     *     *     *     *

"(Q) Have you ever handled the purchase or sale of property for other people in your life?

"(A) No.

"(Q) Have you ever done appraising professionally?

"(A) Yes.

"(Q) Where?

"(A) Oh, for the Bannock County several years ago.

"(Q) Is this for homes or farm land?

"(A) This was for roads."

Appellant's objection that Grimm was not qualified as an expert witness was sustained. Thereafter the witness testified that the market value of his home in Bancroft was down about 50% but he was not familiar with the property of appellant.

On February 8, 1963, appellant wrote a letter to the Village Board discussing the ditch problem and requesting that repairs be made. A portion of the letter reads as follows:

"At the present time, because of work done by the Village, access to my home has been made extremely hazardous. Our fuel tanks, garage, feed lot, are entirely cut off. * * * Some repair has to be made within days, with completion within a reasonable time."

According to appellant's testimony, several meetings with the Board followed after receipt of this letter wherein appellant was promised that something would be done about the ditch, but no action was taken.

Mr. Grimm, a member of the Board, testified that he recalled a meeting between appellant and the Board wherein it was agreed to put in a temporary bridge which could accommodate vehicular access. The plan decided upon was that the Village would furnish the material and a man while appellant would furnish a man, but appellant refused to hire anyone. However, the Board rejected appellant's proposal to install a bridge the width of his property because that would be too expensive.

Fred Modersitzki testified that the Board was in no position to arrange a permanent solution at this time with respect to repairing the ditch until the flood problem was adequately solved. The Board did agree to construct a temporary bridge and with that purpose in mind went ahead and ordered bridge timbers. A city employee was also sent to the property to help with the installation. Appellant was to furnish that portion of the labor for the bridge on his part of the property. However, this plan never materialized, because of appellant's refusal.

The trial court concluded that appellant's letter of February 8, 1963, was sufficient notice under the statute (I.C. § 50–2010) requiring the filing of a claim for damages and respondent took no appeal from this finding and conclusion. The court held, however, that the culvert was jointly owned by both appellant and the Village and that as such, there was a joint obligation to maintain the same. The Village, moreover, had honored its obligation by tendering material and a portion of the labor for reconstruction of the culvert which appellant refused to accept, thereby precluding his claim for damages by reason of his failure to perform this joint duty.

Initially, respondent contends that appellant's letter was insufficient notice for the purposes of the Idaho statute. Former I.C. § 50–2010 reads in pertinent part:

"All claims for damages against cities of the second class and incorporated villages must be filed with the clerk within six months after the time when such claim for damages shall have accrued, specifying the time, place, character and cause of said damages."

The purpose of this statute is to give a city notice of the claim and the consequent opportunity to ascertain the extent of the damage, investigate its causes and determine the liability of the city. McLean v. City of Spirit Lake, 91 Idaho 779, 430 P.2d 670 (1967). Substantial compliance with the statute is all that is required so that city authorities may be able to make a full investigation of the cause of the damage and determine the city's liability therefor.

Appellant's letter of February 8, 1963, specifically refers to "this year's flood" and sets out the character and cause of the injury as the impairment of access to his home and property because of the acts of the Village. This letter is in substantial compliance with the statute and sufficiently informed the Village of the time of the flood and the resulting damage.

Appellant contends that the trial court erred in failing to conclude that the Village, by its actions, materially interfered with and diminished his right of access—ingress and egress—to and from his property resulting in decreasing the value of his property.

This court has consistently held that access to a public way is one of the incidents of ownership of land bounding thereon. Such right is apppurtenant to the land and is a vested right of which the lot owner cannot be deprived without just compensation. Johnston v. Boise City, 87 Idaho 44, 390 P.2d 291 (1964); Farris v. City of Twin Falls, 81 Idaho 583, 347 P.2d 996 (1959). In Village of Sandpoint v. Doyle, 14 Idaho 749, 757, 95 P. 945, 947, 17 L.R.A.,N.S., 497 (1908), this court stated:

> "While the public generally may have no special or particular interest in the right of ingress to any particular lot owner's property, the lot owner has a very material and special interest in having the public reach his property and place of business, and in his right to go and come and carry on business and invite the public to his place of business. It has been held by the courts that to cut off this right of ingress and egress would be to take the lot owner's property without due process of law." (Citations omitted.)

It is undisputed in the instant case that appellant was cut off from all vehicular access both to and from his property and that this property is, in effect, isolated from the public right of way. As such, appellant is entitled to any just compensation which he can prove by way of damages to his right of vehicular access. (Compare Snyder v. State of Idaho and City of Boise, 92 Idaho 175, 438 P.2d 920, March 25, 1968.)

The measure of damages for the destruction or impairment of a right of access is the difference between the fair market value of the property immediately before the taking and the fair market value of the same property immediately after the destruction or impairment of such access. Lobdell v. State ex rel. Board of Highway Directors, 89 Idaho 559, 407 P.2d 135 (1965).

Appellant alleged that his property was devalued in the amount of $5,500 by reason of the Village's actions in removing the culvert and enlarging the ditch. He testified that as owner of the property its fair market value prior to removal of the culvert and enlargement of the ditch was $14,500. This figure was based upon the amount of money he had expended in improvements upon the premises excluding his own labor. He further testified that after access to his property had been substantially impaired its market value was $9,000, i. e., the highest price he could command upon resale.

It is settled rule in Idaho that the owner of property is a competent witness to its value, as he is presumed to be familiar with its value by reason of inquiries, comparisons, purchases and sales. Riley v. Larson, 91 Idaho 831, 432 P.2d 775 (1967); Rankin v. Caldwell, 15 Idaho 625, 99 P. 108 (1908).

On the other hand, respondent's only witness as to the measure of damages testified that market values for real property in the Village were generally down 50% after the 1963 flood and the trial court properly ruled he was not qualified to testify as an expert witness. Moreover, the witness admitted that he was not even familiar with the property under dispute. Thus his testimony is clearly incompetent, and the evidence adduced by appellant stands unrefuted and uncontradicted.

The judgment of the district court is reversed and the cause remanded with directions to enter a judgment in favor of the appellant for damages in the sum of $5,500. Costs to appellant.

SMITH, C. J., and TAYLOR, McQUADE and McFADDEN, JJ., concur.